All right, our third case for this morning is Matthews against Commissioner Saul and we have Mr. Sellers and Mr. Budde and so Mr. Sellers you may begin. Good morning, thank you. May it please the court, counsel, Joseph Sellers on behalf of the appellant Hosea Matthews. The administrative law judge's decision in this case denying Matthews' claim for disability benefits is incomplete and adverse decision on his claim. Nobody disputes that Matthews has narcolepsy or suffers from its symptoms which include overwhelming drowsiness and sudden attacks of sleep. So Mr. Sellers, can I ask you, where in the structured analysis that the administrative law judges are supposed to go through does this kind of problem come up? It's obviously not an exertional limitation. If you fall asleep all the time maybe you can pick up 10 pounds or maybe you can pick up 50 pounds when you're awake. Is it concentration, persistence, or pace or is it some other place? I believe that is the closest area that would apply to a condition like this with these symptoms which are relatively unique compared to other types of impairments analyzed by ALJs. But yes, it is. I was going to say looking at the RFC that the ALJ drafts which is on page 6 of 12 of the ALJ's opinion under paragraph 5, what one does not see is something about or in the hypothetical given to the vocational expert, one doesn't see and the person can take an unscheduled, at least one unscheduled nap during the day, right? Is that the essence of your complaint? That is the gravamen in the case, Your Honor. That this occurs from overwhelming drowsiness and sudden attacks of sleep that can strike at any point during the day. And he doesn't have control over when he takes a nap, even though somebody gave him advice about don't take naps, but this is not voluntary under this condition, right? That's correct, Your Honor. He has no control over whether he falls asleep, whether he becomes overwhelmingly drowsy, or whether he can be alert and function normally. He has begun to learn some signs of when he's about to fall asleep, but he has no control over whether he's going to sleep. And he's tried several different medications which have not provided any lasting relief. And that is, as Your Honor pointed out, the basis of this claim, that regardless of whether he hasn't had much treatment, regardless of whether the AOJ has accounted for that drowsiness in high-risk, hazardous situations, she still failed to consider or even contemplate whether the same risks that apply in hazardous situations would also apply in less threatening aspects of the workday, like assembling a small part at a workbench, or mopping the floor, or folding laundry. Right, or even more pragmatically, you know, if the would an employer want to hire somebody who randomly falls asleep? She didn't believe the six times a day, so I'm being very careful not to mention that. But even once a day, I understand you'd be arguing that at least the vocational expert was never asked that question, right? That's correct. The closest it got to a question with that limitation was unscheduled breaks of 20 minutes. And the vocational expert testified that that would make the employee unreliable and therefore not fit for competitive employment. Mr. Sellers, did your client in front of the AOJ in the proceedings, did he argue for that kind of limitation and flexibility, or was he making that the much broader point about the six naps? I think... In other words, in other words, can we fault, if you can point us to where the, you know, I think the argument gets a lot more traction if you can point us to where he specifically was asking for that kind of more limited restriction rather than the six. He never explicitly put in writing or in an argument that one nap a day would preclude work. Did he argue that in substance? On cross examination, he did ask about the unscheduled breaks, which would cover both a single nap or the overwhelming drowsiness that would require him to or force him to stop working during the day. And regardless of whether the claimant or his representative at hearing expressly made that argument, the AOJ is still required in this non-adversarial proceeding to cover all of the limitations that are reflected in the record. And the treatment notes, however sparse, do establish that Mr. Matthews does suffer from this overwhelming nap per day. And the AOJ's RFC, the AOJ's hypothetical, as Judge Wood pointed out, do not even touch on that, even though she does acknowledge, the AOJ that is, does acknowledge that the drowsiness and sudden attacks of sleep would cause problems in hazardous situations. And beyond that, the claimant's allegations of more frequent naps and more frequent bouts of overwhelming drowsiness implicitly argue that he would have these unscheduled, unpredictable, uncontrollable breaks during the day. And the AOJ, while she did discount those allegations, did so improperly. She relied on his activities, which are consistent with his allegations. She never explained how his activities, which are done in spurts between narcoleptic episodes, contradict his allegations or support a finding that he could work full-time competitive work. She relied on his past work, but that was just her speculation about what an employer might do, given his proclivity to fall asleep during downtime. Her speculation does not rebut Matthew's sworn testimony that he was hired by his mother's best friend, allowed to sleep during downtime, but was fired as soon as he fell asleep, loading a lawnmower onto a truck, posing a threat to himself and others. That same fact pattern and that same result would apply whether he's loading lawnmowers onto a workstation assembling products, as the vocational expert's testimony suggests. Right, and I understand you to be saying that both the landscaping company and the tire shop were actually instances of unsuccessful adaptation. Was there a doctor anywhere who said that he just doesn't have narcolepsy? No. No doctor doubted that he had narcolepsy. The AOJ found it to be a and that impairment by its nature causes the exact symptoms that Matthew's complained about. And no one doubted that he has the symptoms. And that's the essential fact of this case is that no one doubts his diagnosis. No one doubts the symptoms. They only restrict them as a result of those symptoms to hazards from hazards, and they don't consider or contemplate the same effect in less threatening situations. Okay, well, if you'd like to save the rest, um, we can do that. Thank you, Your Honor. I would. All right. Thank you, Mr Buddy. May it please the court Council Stephen Buddy for the Commissioner of Social Security. I want to start by just briefly addressing two points. The first is that just the existence of an impairment does not prove disability. Narcolepsy may cause symptoms that are common to a lot of people who have narcolepsy, but not everyone who is narcoleptic is disabled. The second point is, according to the regulations and agency policy, a claimant's subjective allegations alone do not prove disability. There must be in this case, every doctor's opinion supports a decision. No doctor suggested that Matthews had any medical need to nap. His own position advised Matthews to avoid driving, stick to a routine and not to take naps. But let me just interrupt and say what concerns me about that position, which I read in your brief as well, um, is the inability to control when one experiences either an episode of sleep. People actually go into REM sleep when they have narcolepsy, which is pretty extraordinary. Um, and so I don't know where you find a doctor who reports his his own narcolepsy to be as mild as you're suggesting the record says it is. He's telling Dr Agha that he has naps and Dr Agha says try no naps, but he can't do it. Um, and then, of course, the administrative law judge gives this not terribly useful comment about his account of his symptoms is only partially credible. But let's, you know, he reports to Dr Holly that he could fall asleep at any time, including while bathing, eating, using the toilet. His daily activities or things that he inserts into periods when he's not asleep. He actually had some accidents anyway, and you criticize him for not going to the hospital, but maybe they didn't need hospitalization. I mean, it seems this is a very troubling record. My response overall would to be to point out that no doctor issued any opinion that he was more limited than the ALJ found. This isn't a case where the ALJ made up the RFC out of whole cloth. Methadone's own providers never issued an opinion that he couldn't work. Um, but state interviewers... asked to do that. I mean, he goes, he goes to see Nurse Hushaw, however she pronounces her name, and she refers him to the neurologist. He goes to Agha, um, and Agha diagnoses narcolepsy after the sleep study, prescribes the provigil. Uh, then he has his insurance problems. Um, I mean, Anand needs a lot of appointments, and Dr. Agha's throwing different prescriptions at him. Um, it's, I don't know, it's a, it's not quite such a clean record as you're portraying it to be. I would just remind the court that it's the claimant's burden ultimately to prove his limitations. Um, I don't see the doctors being asked to provide opinions, but they did recommend restrictions, and the ALJ credited what they said. Um, and there were doctors who were asked to provide their opinions about his capacity, the reviewing doctors. There's even a medical expert who testifies at the hearing, um, who confirms that, in his opinion, Matthews can perform, uh, a full range of exertional work with the postural and hazard restrictions. Of course. As I said, exertional doesn't have anything to do with whether you're awake or not. I mean, it's the unscheduled breaks, or the unpredictable breaks that would, that don't find their way into the RFC, or the hypothetical. Well, the ALJ specifically asked Dr. Nymagata if those restrictions were all of the restrictions he would define from the record. Dr. Nymagata confirmed that they were. Dr. Nymagata could easily have testified that there would be a need for breaks if he so opined, but he did not opine that. Neither did the state agency doctors, and Matthews' doctors at best were silent on the issue. So we have a case where every doctor's opinion supports a decision. This court has repeatedly affirmed decisions in similar circumstances. Um, and simply because Matthews reported, uh, taking naps to survivors does not prove that he had a medical need to do so. Um, his doctor, as I mentioned, actually said he should not take naps. Well, of course he shouldn't. Go ahead. No, I, I have one, um, I had an impression from the record, and it, it may not be accurate, but you can comment on it, Mr. Sellers can, if you'd like. My impression was that the ALJ, these are my words and my inferences, that, that the ALJ kind of thought Mr., uh, Mr. Matthews kind of walked himself into this situation by pressing the six naps a day. In other words, that he spent, he spent a lot of credibility in the, in the hearing by pressing the six naps a day because it just seemed, you know, overblown or it came off as overblown. And he didn't advance a much more limited and you know, that he needs, um, at least a nap during a standard workday. Is that a fair or unfair impression? I think that's fair. I think it goes a little further, even though, uh, Matthews also reports falling asleep unpredictably, falling asleep while bathing, uh, while, uh, engaged in activities. Um, yeah, he's still, of course, driving, uh, biking, working, um, other sorts of activities. And the record shows. But he has a traffic accident while he's driving and he falls off his bicycle and he's fired from the two jobs that he has. Isn't that evidence from the outside beyond his reports that this is a real problem? Matthews still continues to engage in those activities. I think it's the ALJ's point. I can think of all sorts of people who engage in foolish behavior. Every time I see somebody riding a bicycle without a helmet, I personally think they're engaged in foolish behavior, but people do it. There could be other explanations. I mean, there could be, uh, other ways to view this record. Um, the defendant certainly concedes that, but the issue before the court really is just, there's more than a scintilla of evidence to support the decision. That's the substantial evidence standard. Um, and I just turned back to the opinions. In this case, we have four doctors and a nurse practitioner. None of them recommended any restrictions greater than the ALJ found. There's a medical expert who reviewed the entire record. His opinion was consistent with the ALJ's decision. Um, and the ALJ shouldn't be required to second guess the experts or come up with his own or her own, uh, limitations. But the ALJ, I'm looking now at page nine of the ALJ's opinion. The ALJ draws an inference from the landscape job that his restriction, that his narcolepsy restrictions are not that bad. He testified that he was able to work eight hour days as a landscaper for three months in the summer of 2016. That's not the complete testimony. The testimony is because he was sleeping in the back of the truck and then he got fired, you know, with this lawnmower incident, whatever that was. So the ALJ isn't reporting the evidence reliably here. Um, that, that was, that was an unsuccessful effort at work. I think the ALJ's, the ALJ's point was that, uh, the ALJ inferred that a person likely would not be able to sustain a full time job for three months if the person were falling asleep at that frequency and having those issues. He explains exactly, if the ALJ had said, even though he was working for the mother's best friend and was sleeping in the truck most of the time, you know, were off and on, let's say, during the day. This was not somebody who was, say, working on the floor of Walmart, eight hour days, where lots of other supervisors were looking at them and they could see that they were on the job. That might be evidence of a successful effort at work that would greatly undermine his claim. But that's not what this is. I don't think the ALJ is using this as evidence of a successful work effort. The ALJ's only point really is that the degree of limitation the claimant alleged is not supported by the record. But she doesn't, she doesn't question the, um, she doesn't cope with the, with the issue that he reports that he's sleeping frequently during the landscaping job. He's not working eight hour days. That's an inaccurate statement of his testimony and there's no other evidence of it. So does the ALJ just assume it's the eight hour day or is there testimony? I believe there's testimony that there's an eight hour day. He does allege sleeping during that day, but the ALJ obviously doesn't find his allegations supported by the record. Which we don't find here. We don't find that, that, that confrontation of the evidence that would be helpful. Well, this court affirmed many times that ALJs are required to discuss every piece of evidence. Well, but the important ones you are supposed to discuss, and if this was not actually evidence that he could work for three months in an eight hour day job, then the ALJ needs to explain herself. The commissioner would just respond that that's only one small aspect of the decision. The larger point for, uh, from the commissioner's perspective is that every doctor's opinion supports the decision. Uh, even if the reasons are not flawless for the subjective symptom analysis, uh, they're not required to respectfully request that the court affirm the decision. All right. Thank you very much. Then, Mr. James. Anything further, Mr. Seller? I'm sorry, Mr. Buddy. Um, anything further, Mr Sellers? Yes. Thank you, Your Honor. I just wanted to respond to Judge Scudder's, um, statement about the impression he drew from the record about Matthew's pressing the six times a day issue. Um, I'd point out first that I don't think he pressed the six times a day issue. He didn't even quantify it until the ALJ asked him how often he fell asleep. And he said, to quote from page 49, Well, that's a lot. I say like six times. Beyond that, there wasn't much discussion about the frequency. Um, I'd also point out that regardless of whether the ALJ believes he overstated that frequency and whether he exaggerated it even, it's still the ALJ's duty to reach a conclusion about what frequency she did credit. And once she determined how often she did credit his uncontrollable bouts of sleeping, she had to then account for that in her RFC and hypothetical. That is the glaring error in her RFC that regardless of whether she credited his opinions or discredited them properly, she still failed to account for the limitations that she did find consistent with the record. And for that reason, this case should be remanded because the ALJ's decision is not supported by substantial evidence. Thank you. All right. Thank you to both counsel. We will take this case under advisement.